405 P.2d 481

Francisco OLIVAS and Sebastiana Olivas, his wife, Sebastiana Olivas, as President of the Tribal Council of the Yaqui Indian Tribe at Guadalupe, Arizona, Manuela Florez, a widow, Angel Morales, a single man, and all subsequent named defendants, Appellants,

v.

The BOARD OF NATIONAL MISSIONS OF the PRESBYTERIAN CHURCH, UNITED STATES OF AMERICA, a New York corporation, Appellee.*

1 CA–CIV 79.

Court of Appeals of Arizona.

Sept. 9, 1965.

* This appeal was filed with the Arizona Supreme Court and assigned that Court's Number 8083. The matter was referred to this Court pursuant to Section 12–120.23 A.R.S.

**544**

V. L. Hash, Phoenix, for appellants.

Snell & Wilmer, Thomas E. Parrish, Phoenix, for appellee.

**DONOFRIO, Judge.**

This is an appeal from a judgment quieting title and declaring a trust in approximately 100 acres of land in the Presbytery of Phoenix, an Arizona Corporation. The land is part of the settlement known as Guadalupe, Arizona, near the cities of Phoenix and Tempe.

As background it would serve us to quote with the author's permission from a manuscript, not yet published, condensing a history of the Guadalupe Yaquis:

"The real history of Guadalupe village also began on May 1, 1910. At that time a considerable group of Yaqui Indians were living approximately a mile and a half northeast of the present townsite of Guadalupe. This is in the vicinity of the Double Buttes Cemetery near Tempe. Mr. M. J. Dougherty, the first of a long list of Arizona Bar members to aid the Yaquis, reports that this particular group were trapped in the mountains of northwestern Sonora by Mexican troops and to escape their pursuers crossed the American Boundary just west of Sasabe. A missionary priest, who had been working in the vicinity of Caborca in the Altar River Valley of Sonora, accompanied the Yaquis on their escape across the border. * * * Harassed by local farmers and ranchers who did not want them on or near their property, they settled on open land adjacent to the cemetery. As M. J. Dougherty says:

'At that time they were without food, clothing or shelter, and were suffering from various illnesses and starvation diet. At that time—1909–1910—they were substantially savages—prone to petty thievery and the stealing of cattle and horses and also given to the drinking of a native intoxicating drink made from desert plants. As a consequence it was impossible to find any individual who would provide or sell the missionaries any land for the use of the Indians * * *. In fact all of the communi-

ties were up in arms at any suggestion of locating these Indians in the populated communities.'

Father Lucius, the priest in charge of the Catholic Parish at Tempe, Arizona, assumed the responsibility for helping these desperate people. Old timers in the valley will recall that appeals were regularly made for old clothing, food, and money 'to help the Yaquis'. Pete Estrada, present county law librarian, recalls that his father, a Mayo Indian who spoke and understood a language related to Yaqui, both individually and as Town Marshall of Tempe, worked hard to help the Yaquis adapt to their new environment."

In January 1960, Francisco Olivas and Sebastiana Olivas, his wife, individually and as members of the Yaqui Tribe, and Sebastiana Olivas as President of the Tribal Council of the Yaqui Indian Tribe at Guadalupe, who are appellants herein, brought a forcible entry and detainer action against Tony Soto and others, doing business as Lucero's Second Hand Store, covering part of this 100 acres. The action was contested by the defendants. Thereafter in August 1960, while said action was still pending, The Board of National Missions of the Presbyterian Church, United States of America, a New York corporation, appellee herein, filed a quiet title suit covering these 100 acres against some 128 defendants, including the plaintiffs in the forcible entry and detainer action. The quiet title suit was later amended to allege that a trust was created by a deed dated January 17, 1924, and prayed for a declaration of the trust and a definition of the duties of the trustee.

Ninety five of the defendants served made no appearance in the action. Appellant Sebastiana Olivas, individually and as member of the Yaqui Tribe and as head of the Tribal Council for the Yaqui Indians, who was also plaintiff in the forcible entry and detainer action (Cause No. 113013) filed an answer admitting the trust and affirmatively alleging:

"That the Settlor of said trust specifically intended said real property as a homesite for Yaqui Indians; that plaintiff herein has without right, allowed or permitted others to lease portions of said real property as and for business ventures, more specifically the Defendants named in Cause No. 113013; that the Trustee's duties under said Trust instrument are not clearly defined."

The prayer reads:

"WHEREFORE, this answering defendant, individually, as a member of the Yaqui Tribe and as a member of what is referred to as the Yaqui Tribal Council for Yaqui Indians residing on the above described real property, declares that said real property is held in Trust as a homesite for herself and other Yaqui Indians.

"2. That this Court in conformity with the wish of the Settlor of the Trust, appoint the group known as the Yaqui Tribal Council, or the successors thereto, as a co-Trustee with Plaintiff herein, to pass upon who shall move upon said property, and the rules and regulations for living thereon."

The two actions were consolidated and tried before the court. After hearing the evidence and taking the matter under advisement the court rendered the following judgment:

"The Presbytery of Phoenix, an Arizona corporation, is the sole owner of the property described in the Complaint, in trust nevertheless for the Yaqui Indians, Mexicans and other races which now occupy said property, and who are poor and are in need of land on which to reside.

As Trustee the Presbytery of Phoenix shall determine who may move on said property; may promulgate rules and regulations for the residents to abide by; may maintain a church on said property and shall allow within reason other churches on said property; and shall provide water and other utili-

ties for said residents as the Trustees may deem necessary."

The basic issue involved is whether the trial court was correct in quieting title to the property in the Presbytery of Phoenix as trustee and whether it was correct in declaring the beneficiaries of the trust the Yaqui Indians, persons of Mexican descent and other races who are poor and who are in need of land on which to reside.

The history of this particular land as borne out by the evidence, began in the early 1920's with a Mrs. Jenny Adamson Biehn. From the time she was a girl, Mrs. Biehn had a great desire to be a missionary and help the needy Indians but was unable to do so in any great measure until she became a widow. At that time, having some funds of her own, she sought an alliance with Dr. Logie, who was then superintendent of The Chas. H. Cook Bible School, and went to Guadalupe, Arizona, to minister to the needy people of the Yaqui Indians. In 1924 she purchased the 100 acres in question in Guadalupe for this purpose. The property was purchased from Leonard and Josephine S. Vance and was conveyed by Warranty deed directly to The Chas. H. Cook Bible School "for homesites for Yaqui Indians." Title was subsequently conveyed to The Board of National Missions of the Presbyterian Church, United States of America, and on January 23, 1948, The Presbytery of Phoenix was vested with legal title by virtue of a warranty deed from The Board of National Missions. At the time of the conveyance in question, The Chas. H. Cook Bible School was operated as an agency of the Synod of Arizona of the Presbyterian Church. Since then the Presbyterian Church, through its various agencies, has been carrying out what they understood to be the wishes of Mrs. Biehn with respect to the land in question. The first church was built on this land in 1927 or 1928. Subsequently, a parcel of approximately seven acres was conveyed by quit claim deed to the Rural School District of Tempe where a school is now located. There

were at the date of trial approximately 625 students enrolled in this school.

When the property was originally obtained by The Chas. H. Cook Bible School from the Vances, it was conveyed subject to a mortgage in the amount of $1,143.00 plus 7% interest. This mortgage was paid off by the grantee, The Chas. H. Cook Bible School. Since the date of the original conveyance in 1924, various agencies of the Presbyterian Church have expended approximately $100,000.00 in improving and administering the land in question. The improvement consisted of drilling a water well, piping water to the people and cleaning out the well; the construction of a child care clinic and a home for the minister; and the purchase of equipment for the child care clinic. The remaining portion of the $100,000 was used to pay the salaries of the various ministers and people who have worked on the land through the years. The Presbyterian Church has not required as a prerequisite to obtaining a homesite that the person must be a Presbyterian. Actually the major part of the residents are not in fact members of the Presbyterian Church. Since her death, the various agencies of the Presbyterian Church have promulgated rules to be observed by the people living there.

The instant controversy arose when the appellant Olivas began parceling out homesites on the premises and attempted to collect money to be used for legal costs from residents who were on the land with the permission of The Presbytery of Phoenix. Mr. Olivas purported to represent the Yaqui Tribal Council through an organization which he had started whose offices were held by members of his family. Mr. Olivas was not a Yaqui and lived on the land as did his parents before him by permission of Mrs. Biehn.

All parties agree that the Court correctly construed the deed of conveyance to The Chas. H. Cook Bible School in 1924 as a trust. They disagree, however, as to who is to be the trustee, who are to be the beneficiaries and what are to be its terms.

Appellants in their briefs apparently approached the matter on the basis of a private trust as distinguished from a charitable trust as contended by Appellee.

■ It is important to distinguish charitable trusts from private trusts, different interpretive rules being applicable. The prerequisites for the creation of a charitable trust are the same as those applying to private trusts, except as to beneficiaries. A fundamental distinction between the two is that in a private trust property is devoted to the use of specified persons who are designated as beneficiaries of the trust; whereas a charitable trust has as a beneficiary a definite class and indefinite beneficiaries within the definite class, and the purpose is beneficial to the community. Bogert, Trust & Trustees 2d, § 362, Ch. 19, p. 4. An important difference is that there cannot be a private trust unless there is a beneficiary who is definitely ascertainable within the period of the rule against perpetuities which is not applicable in charitable trusts. Lowell v. Lowell, 29 Ariz. 138, 240 P. 280 (1925); A.R.S. § 33–239. Also the doctrine of cy pres (i.e. where the exact intention of the settlor is not carried out, his intention is carried out "as nearly as" may be.) which is applicable to charitable trusts is not applicable to private trusts.

We must first determine if this is a charitable trust. The only language as to the beneficiaries and the terms of the trust contained in the 1924 deed is the wording "for homesite for Yaqui Indians" in the granting clause. These five words are the only written words regarding the trust itself or its terms.

■ A principle of law generally applied to a trust, either private or charitable, is that a trust based on a written instrument, the intention of the trustor is to be ascertained from the language thereof, and the court may not go outside the language in an effort to give effect to what it conceives to have been the actual intent or motive of the trustor. See 51 A.L.R.2d 820 at § 3(b), p. 825. However if the intention is not plainly expressed, or if the language used is ambiguous, there are certain well-established rules which courts will invoke to aid them in the construction of the instrument.

■ One rule is that the determination of the intention of the settlor or parties to a trust instrument involves a construction of the instrument, where construction is necessary, in the light of surrounding circumstances at the time of the execution of the instrument. The court places itself in the position of the trustor at the time of the creation of the trust and interprets what he has said or done in the light of his environment at that time. 54 Am.Jur. Trusts Section 17, p. 34; Rogers v. English, 130 Conn. 332, 33 A.2d 540, 147 A.L.R. 812, (1943); Restatement of Law of Trusts 2d, ch. 1, § 4, p. 13; Farrell v. West, 57 Ariz. 332, 113 P.2d 866 (1941).

■ In this case the language used does not plainly express the intention of the trustor and therefore it was proper for the court to receive extrinsic evidence and look into the circumstances surrounding the execution of the deed to determine if a trust was intended, and if so, the nature of any trust so created, its terms and its beneficiaries. Scott on Trusts, Vol. 1, Sec. 28, pp. 226, 228; Carrillo v. Taylor, 81 Ariz. 14, 299 P.2d 188 (1956). Although the parties agree that a trust was created we have, nevertheless, looked into the record to determine if there was evidence to support such a finding, and have found abundantly clear evidence to support the judgment in this respect

The evidence established that a trust with a res of 100 acres of land was created by Mrs. Biehn for the purpose, among others, of relieving poverty among the people living in and around Guadalupe (Yaqui Village) whose problems she knew so well, and to provide land on which they could live. Some of the problems the Yaquis faced at the time the trust was created were that they were unwanted near the property of local residents and of necessity had to settle

on open land wherever they could, and that many were without food, clothing or shelter.

■ A trust which has for its purpose the relief of poverty is a charitable trust. Scott on Trusts, Vol. IV, p. 2632, Charitable Trusts § 369; Restatement of Law of Trusts 2d, Charitable Trusts § 359, Vol. 2, p. 249. This is a part of the common law and that we follow the common law in the field of trusts is supported by Lowell v. Lowell (supra). We hold the evidence was sufficiently clear that a charitable trust was intended and created.

We now turn to the objection regarding the Court's designation of the beneficiaries as Yaqui Indians, persons of Mexican descent and other races who are poor and who are in need of land on which to reside.

Appellants seek to limit the beneficiaries to Yaqui Indians. This contention, no doubt, is based on the use of the words "for homesite for Yaqui Indians" found in the deed. Let us answer this by saying that the creation and terms of the trust do not come about solely from the use of these words when the words used, as we have already determined, are ambiguous but from the parol and extrinsic evidence admitted in the case.

The evidence is otherwise replete on the subject, however, it is only necessary to set out the following from the witness (Mr. George Walker) to support the Court's judgment in this respect:

"Q. To your knowledge did she limit the class of persons who were entitled to move on the 100 acres to those of Yaqui blood?

A. No, I think her desire was to help anyone in need, and, of course, when she went there first I think the Yaquis were predominate in point of numbers but later as there came an infiltration of the Mexican people I think she used her good will and desire to help them also.

"Q. Could you describe for the Court the nature of the services which Mrs. Biehn provided for these people?

A. I would say, I think that it was quite larger of a sociological nature. She ministered to the needy youngsters of the tribe where there was disease, malnutrition, lack of clothing and that sort of thing as best she could. She used her money for that purpose and then with this alliance that she had with Dr. Logie there were preaching services held down there at times by the students and by Dr. Logie from the Cook Bible School."

and from the testimony of Mrs. Ruby Wood, a teacher of 30 years in Guadalupe:

"Q. From your knowledge of the persons who were living on the 100 acres at the time you first went to Guadalupe School down there do you know if Mrs. Biehn allowed persons other than Yaqui Indians to move on there?

A. Oh yes, when I went to Guadalupe there were Puerto Ricans, the Robles family, there were Yaquis, there were Mexicans, I don't know of any white families at that time.

Q. Had these persons, the Mexicans, the Puerto Ricans and Yaquis all been allowed to move there?

A. Yes, they were on there when I came in '33 and I am sure they had been there quite a little while."

■ The evidence does not show Mrs. Biehn intended to limit the benefits to persons of Yaqui blood alone. To the contrary she allowed Mexicans and others in need to come on the land and treated them alike, using her good will and desire to help them. Also at the time of the creation of the trust many Yaquis had intermarried with other races so that many were not full blooded Yaquis. Clearly then the beneficiaries intended by Mrs. Biehn were not

restricted to those who are full blooded Yaquis or even of Yaqui descent.

Appellants contend the trust in question is a "dry" or "passive" trust and title should therefore vest in them as beneficiaries. Since we hold this to be a charitable trust and the above is inapplicable thereto we need not further discuss the matter.

Although no specific question is raised regarding the terms that the trustee "may maintain a Presbyterian Church on said property and shall allow, within reason, other churches on said property", we deem it necessary to make some comment thereon. The evidence amply supports these terms in the manner in which the court has stated them. We quote the following testimony of the witness Walker:

"Q. She was a goodhearted person who, along with her charitable work, was preaching the word of God but without any actual affiliation?

A. Very well stated, sir.

Q. Then would it be safe to assume, then, that Mrs. Biehn at any time never expressed a wish or desire, or by her actions ever express a wish or desire that the area in which she was working should someday be Presbyterian in its affiliation?

A. I don't think she cared very much so long as it ministered to the people that she was working with."

Mrs. Biehn obviously intended that the beneficiaries of her trust received spiritual guidance. The trustee she selected was a religious institution. All the evidence supports the view that she desired the Yaqui Community be given opportunity to receive religious training in the Christian Philosophy.

There is no objection to the conveyance of the seven acres to the rural school district nor to the maintenance of the water system or the construction of the child care clinic. We find evidence to support all these as coming within the purpose and plan of Mrs. Biehn's trust.

We find no difficulty in disposing of the remaining questions as to whether the court's judgment was correct in appointing the Presbytery of Phoenix Trustee, and in granting to it power to determine who shall go on to the land and authority to promulgate such rules and regulations as it deems necessary to govern its occupancy of the trust property.

In Lowell (supra) our Supreme Court said:

"The trust in this case being charitable and public in its nature, the courts of the state, by virtue of their common-law and equity powers, have jurisdiction to supervise and control its administration, to prevent its misuse or abuse, and enforce its execution. 11 C.J. 356, § 73." 29 Ariz. pp. 155, 156, 240 P. p. 286.

Mrs. Biehn selected The Chas. H. Cook Bible School which was an agency of the Synod of Arizona of the Presbyterian Church of the United States as Trustee. Thereafter the trust was transferred to the Board of National Missions (Presbyterian) and has finally been placed in the hands of the Presbytery of Phoenix, an Arizona corporation.

A charitable trust will fail for want of a trustee only if the settlor showed an intention that the trust should not arise or should not continue unless the person named by him as trustee, should accept the trust and continue to act as trustee. Reichert v. Mikesell, 73 Ohio App. 504, 57 N.E. 2d 160 (1943); Chellew v. White, 127 Wash. 382, 221 P. 3 (1923); IV Scott, Trusts, § 397, p. 2777 (2d Ed. 1956). We find no such limitation herein, and since the Presbytery of Phoenix was willing to act, and since the trial court had the authority to appoint it trustee this court will not disturb the judgment absent abuse of discretion.

The court has reposed confidence in Presbytery of Phoenix. We are confident

**550**

it will faithfully carry out the intentions of the trustor, and when in doubt of the course to pursue or action to take, seek the advice of the court.

We hold the judgment of the court is supported by the law and the record.

Affirmed.

STEVENS, C. J., and CAMERON, J., concur.