467 P.2d 770

**In the Matter of the ESTATE of
James KIDD, Deceased.**

Joe H. CERNY, Claimant No. 72, Emma G. Clausser, Claimant No. 42, Russell L. Dilts, Claimant No. 22, Psychical Research Foundation, Inc., Claimant No. 4, the American Society For Psychical Research, Inc., Claimant No. 9, and Joseph W. Still, M.D., Claimant No. 91, Appellants,

v.

FIRST NATIONAL BANK of Arizona, Phoenix, a national banking association, Administrator With the Will Annexed, Neurological Sciences Foundation, Inc., as Trustee, and Barrow Neurological Institute, Phoenix, Arizona, Appellees.

**No. 1 CA–CIV 810.**

Court of Appeals of Arizona,
Division 1,
Department A.

April 14, 1970.

Rehearing Denied May 22, 1970.

Review Granted June 23, 1970.

Welliever, Smith, Holt & Smith, by Ted A. Smith, Phoenix, for appellant Cerny.

Emma G. Clausser, in pro. per.

Carmichael, Johnson, Stephens & Vanlandingham, by N. Pike Johnson, Phoenix, for appellant Dilts.

Strickland, Altaffer, Davis & Eppstein, by Thomas J. Davis, Tucson, for appellants Psychical Research Foundation, Inc. and The American Society for Psychical Research, Inc.

Sheldon Stern, Phoenix, Melvin Belli (associated as counsel), San Francisco, Cal., for appellant Still.

Divelbiss & Gage, by G. David Gage, Phoenix, for appellee First National Bank of Arizona.

Gorodezky, Marron & Diamond, by Eli Gorodezky, Allen L. Feinstein, Phoenix, for appellees Neurological Sciences Foundation, Inc. and Barrow Neurological Institute.

DONOFRIO, Presiding Judge.

This is an appeal from the decree of determination of heirship entered in the Superior Court of Maricopa County November 7, 1967. The proceeding in the trial court was to determine heirship in the probate of the will of James Kidd, a petition having been filed pursuant to A.R.S. § 14–641 by The First National Bank of Arizona as Administrator With Will Annexed. Claims and statements of interest were filed by one hundred three persons, including the appellants herein.

On January 2, 1946 James Kidd wrote a holographic will which reads as follows:

"This is my first and only will and is dated the second day in January 1946. I have no heirs have not been married in my life, after all my funeral expenses have been paid and #100. (sic) one hundred dollars to some preacher of the gospital (sic) to say fare well at my grave and sell all my property which is all in cash and stocks with E. F. Hutton Co Phoenix some in safety box, and have this balance money to go in a research or some scientific proof of a soul of the human body which leaves at death I think in time their (sic) can be a Photograph of soul leaving the human at death,"

Evidence in the record indicates that at the time of the hearing on the petition for letters of administration and petition for probate of the will, April 6, 1964, the residuary estate, consisting primarily of stocks and bonds and some cash and other assets, was then valued in excess of $174,000.

On May 5, 1965 the will was admitted to probate upon a determination that Kidd had died testate on or about November 10, 1949, a resident of Maricopa County, Arizona. The First National Bank of Arizona was appointed Administrator With Will Annexed of the Estate of James Kidd, deceased.

On March 31, 1966 the Court, upon a motion for summary judgment filed by The First National Bank of Arizona, as Administrator, ordered:

"That the following words contained in the Last Will and Testament of James Kidd, Deceased, to-wit: ' * * * sell all my property * * *, and have this balance money go in a research or some scientific proof of a soul of the human body which leaves at death' creates a valid charitable testamentary trust."

Subsequently, and in order to determine who could best administer such trust, the Court held hearings upon one hundred three petitions, statements of interest and claims filed by the alleged heirs of Kidd, and by various organizations, institutes, societies and individuals, including the parties now before the Court. Those hearings were held almost continually between June 6 and August 31, 1967.

The Court heard testimony and received exhibits in evidence from more than sixty claimants, and in addition the Court on motion ordered that more than forty claims be submitted on the record. The Court took all of these matters under advisement.

The case was surrounded by considerable public attention, due perhaps in part to at least one magazine article which presented a narrative of the unusual nature of Kidd's will and which appeared in a publication of nationwide circulation at a time before the trial court had issued its decree.[1]

In the decree the trial court, after restating its conclusion that a valid charitable trust had been created by the language of the will, concluded that such bequest,

"\* \* \* be used for the purpose of research which may lead to some scientific proof of a soul of the individual which leaves the body at death; that considering the language of the Last Will and Testament of the deceased as a whole, it was the intention and desire of the deceased that the residue and remainder of the estate be used for the purpose of research, which may lead to some scientific proof of a soul of the individual human which leaves the body at death, and that it is incumbent on the Court to insure that the residue and remainder of the estate of the deceased be used in such a manner as to benefit mankind as a whole to the greatest degree possible and that this can best be accomplished by the distribution of said funds for the purpose of research which may lead to some scientific proof of a soul of the individual human which leaves the body at death; \* \* \*."

The Court then determined that this research could most beneficially be carried out in the combined fields of medical science, psychiatry and psychology and that such research could best be performed by the Barrow Neurological Institute of Phoenix, Arizona.

Neurological Sciences Foundation is a nonprofit corporation organized for charitable, scientific and educational purposes and is authorized to act as trustee of trust funds. It is the organization through which funds are received for the purpose of financing the research projects performed and carried on by the Barrow Neurological Institute. The trial court determined that the Neurological Sciences Foundation was the proper organization to receive the funds of the Kidd estate in trust for the purpose of research to be performed by Barrow Neurological Institute.

By its construction of Kidd's will and by conclusions drawn therefrom the Court denied the petitions and statements of interest of all other claimants, including the appellants and the alleged heirs.

Post judgment motions of the parties were heard by the Court on November 27, 1967, and were severally denied.

On this appeal only six of the original claimants are left as bona fide appellants. None of the parties before this Court contests the validity of the will. They contend that the trial court incorrectly construed the intent of the testator, substituted its own charitable scheme or purpose for that set out in Kidd's will, and abused its discretion in granting the petition of Barrow Neurological Institute/Neurological Sciences Foundation. Appellants contend that the Decree of Determination of Heirship should be reversed and remanded with directions to award the residue and remainder of the estate to these appellants, jointly or singly as trustee(s), in trust for the purpose of doing "research or (obtaining) some scientific proof of a soul of the human body which leaves at death", as set out in the testator's will.

Two principal questions are presented on this appeal. First, it must be ascertained whether the trial court was correct in construing the will to establish a charitable bequest to be held in trust for the purpose of "research which may lead to some scientific proof of a soul of the individual human which leaves at death." Secondly, assum-

---

1. Hamblin, THE STRANGE QUEST OF JAMES KIDD, Life V. 62, March 3, 1967, at page 76.

ing such charitable trust was created, we must determine whether the trial court abused its discretion in distributing the estate to Neurological Sciences Foundation as trustee to be used for the purpose of research which may lead to some scientific proof of a soul of the individual human which leaves the body at death, to be performed and carried on by Barrow Neurological Institute.

## WAS THERE A VALID CHARITABLE TRUST CREATED BY THE TERMS OF KIDD'S WILL?

Consideration must first be directed toward the trial court's finding that Kidd's will created a charitable trust. The Restatement (Second) of Trusts defines a charitable trust as:

"* * * a fiduciary relationship with respect to property arising as a result of a manifestation of an intention to create it, and subjecting the person by whom the property is held to equitable duties to deal with property for a charitable purpose." Restatement (Second) of Trusts § 348 (1959).

Arizona has accepted the Restatement definition of a charitable trust. State ex rel. Goddard v. Coerver, 100 Ariz. 135, 412 P.2d 259 (1966). The Arizona Supreme Court in Coerver noted that whereas the settlor must manifest an intention to create a charitable trust, it is not necessary that any particular words or conduct be manifest to create a trust, and it is possible as in the case of Kidd's will, to write a trust without using the words "trust" or "trustee." See 1A. Scott, The Law of Trusts § 24 (3rd ed. 1967); Restatement (Second) of Trusts § 351 (1959) Comments a–c.

Where, as here, no trustee is named in the will, the Court will name one. Olivas v. Board of Nat. Mis. of Presbyterian Church, 1 Ariz.App. 543, 405 P.2d 481 (1965); Restatement (Second) of Trusts § 397 (1959) Illustration 2, Comment d; 4 A. Scott, The Law of Trusts § 388 (3rd ed. 1967).

Our attention is next directed to the testator's purpose. Scientific research is a valid purpose for a charitable trust:

"Not only is it of great social utility that existing knowledge be disseminated as widely as possible, *but it is also highly desirable that research into new realms be encouraged* in that discovery may increase human happiness, security and comfort." C. Bogert, Trusts § 375 (2d ed. 1964). (Emphasis supplied).

(Our Supreme Court has said in In re Estate of Harber, 99 Ariz. 323, 409 P.2d 31 (1965) that medical research is a proper charitable purpose.

The fact alone of failing to designate a specific beneficiary does not prevent the creation of a charitable trust. We said in Olivas, supra:

"* * * The prerequisites for the creation of a charitable trust are the same as those applying to private trusts, except as to beneficiaries. A fundamental distinction between the two is that in a private trust property is devoted to the use of specified persons who are designated as beneficiaries of the trust; whereas a charitable trust has as a beneficiary a definite class and indefinite beneficiaries within the definite class, and the purpose is beneficial to the community. * * *" 1 Ariz.App. 543 at p. 547, 405 P.2d 481 at p. 485.

Appellant Emma Clausser argues, inter alia, that the words in Kidd's will "sell all my property" demonstrate an intent of the testator to cash and distribute the estate assets. Both appellants Cerny and Clausser attack the finding by the trial court of a charitable trust, arguing that there was no trust intent flowing from the language of the will. We disagree with this contention. It is our opinion that a fair reading of the entire will supports the creation of a trust and that the trial court did not err in construing Kidd's will to create a charitable trust.

The rule is well established in Arizona that wills are to be construed liberally

·so as to give effect to the intent of the testator, no particular form being required so long as there has been compliance with ·the statutory requisites. Isaak v. Superior ·Court, 103 Ariz. 445, 443 P.2d 911 (1968); In re Estate of Harber, supra; Newhall ·v. McGill, 69 Ariz. 259, 212 P.2d 764 (1949); Estate of Miller, 54 Ariz. 58, 92 P.2d 335 (1939); Estate of Tyrrell, 17 Ariz. 418, 153 P. 767 (1915); LaTourette v. LaTourette, 15 Ariz. 200, 137 P. 426 (1914). We believe that the trial court has properly interpreted the testator's intent by its con-.struction of the will, and that the decree is :reasonably supported by the evidence.

## ·WAS THE SELECTION OF THESE APPELLEES TO RECEIVE AND ADMINISTER THE PROVISIONS OF THE RESIDUARY BEQUEST AN ABUSE OF THE TRIAL COURT'S DISCRETION?

Except for the contentions of appellants Cerny and Clausser already noted, the valid-·ity of the residuary bequest as a charitable trust is not questioned. In order to sustain ·their respective claims the appellants must be in at least implicit agreement that the residuary bequest is valid. The crucial issue is the propriety of the trial court's se-·lection of the trustee.

Each of the appellants before this Court asserts that the trial court erred in° the ·naming of Neurological Sciences Foundation as trustee of the charitable trust proceeds, with Barrow Neurological Institute ·as beneficiary. In order to better present the position of the appellants herein, a brief synopsis of the position taken by each one is appropriate.

Appellant Emma Clausser, appearing in .propria persona, has as the basis of her claim a purported actual experience of seeing her soul leave her body during an experiment for which she volunteered in .Stuttgart, Germany, in 1937. Incident to ·this, she alleges, she was injected with what ·was at that time an experimental drug. She claims that the same drug was injected in a male volunteer and that he too experi-·enced the sight of his soul leaving his body.

Emma Clausser's position, thus, is that the aforementioned experience constitutes "some scientific proof" of the fact that a soul exists and that on that basis she is entitled to the residuary bequest, contending she has satisfied the intent manifested in Kidd's will.

Appellant Joe Cerny presented in the trial court an inductive argument based upon Biblical and other writings and historical documentation supporting the Bible. Cerny's argument before this Court is that in the following language of Kidd's will, " * * have this balance money to go in a research or some scientific proof of a soul * * ", the word "or" is disjunctive and that the words appearing thereafter should have been construed as supporting the proposition that the testator in fact wanted primarily scientific proof of the existence of a soul. Cerny's argument appears to be that only if such proof were not available, would research efforts to discover whether a soul exists be a valid expression of Kidd's intent. Thus he is arguing, as is appellant Clausser, that the will set up a "contest" and that he best satisfies it.

Appellant Dilts in his argument before this Court does no more than incorporate the statement of the case, facts, and arguments of all other appellants insofar as they are not inconsistent with his claim. Thus, his argument must stand or fall with all other appellants. In his presentation to the trial court it was elicited that his background included research into proof of the soul.

The Psychical Research Foundation was founded in 1960 as a nonprofit, charitable corporation. As stated in its Articles of Incorporation, its purpose is to engage in "scientific and educational activities proximately directed toward securing and disseminating reliable information with respect to the survival, upon termination of the living organism, of the mental, spiritual, or personality characteristics of man or any parts or aspects of them." The Psychical Research Foundation is concededly very similar to the American Society for Psychi-

cal Research, Inc., and on this appeal these appellants are represented by the same counsel. From the record it appears that the only material difference between the two is with respect to the scope of their research, that of Psychical Research Foundation being "specifically limited to research of survival after death", but generally including the kind of research carried on by the American Society for Psychical Research, Inc. Thus, the following description of the activities of American Society for Psychical Research is also descriptive of Psychical Research Foundation activities.

The record indicates that the American Society for Psychical Research dates from 1906, and was organized by William James, a prominent American psychologist. This Society has had among its 1400 members such well known members of the scientific and academic community as Sigmund Freud and Margaret Mead, and is currently headed by Dr. Gardner Murphy, a Harvard-trained psychologist employed by the Menninger Foundation as Director of Research. The American Society for Psychical Research publishes a quarterly journal, has a working capital of approximately $700,000, and occupies a five-story building in New York City. It has as one of its stated purposes psychical research. On direct examination at the hearing on the petition of the American Society for Psychical Research, testimony was adduced as to the meaning of psychical research. In part, Dr. Murphy's testimony in this regard is as follows:

"Q Will you tell us briefly what psychical research is?

"A Psychical research is the study of psychological processes for which we have no physical explanation as physics now exist.

"If, for example, we communicate through sound waves this would be approached in physical terms, but if we can engage in telepathic interchange this would be carried out by some process that is not explainable in terms of contemporary physical theory.

"Q Can you give us some samples of areas which are encompased (sic) within the framework of psychical research?

"A Telepathy would stand up quite prominently and would include both experimental telepathy or attempts to convey specific information.

"Q What does telepathy mean?

"A Telepathy is the exchange of information from one person to another by means other than the sensory.

"Q Can you give an example?

"A In the collection of so-called spontaneous cases of telepathy you find, for example, the following: Mrs. Packet at work in her kitchen is suddenly overwhelmed by a vision of her brother being hurled to his death. She is sure that this means something that is not accidental. In time it turns out that her brother working on a tugboat in Chicago Harbor tripped over a rope and was thrown to his death approximately at the time.

"These so-called spontaneous cases or crisis apparitions have been collected by the hundreds and are independent, of course, of certain natural studies.

"Q Are there any other areas of psychic research that you would like to relate to the Court?

"A Psychical research would also deal with so-called second sight or clairvoyance in which a person might get an impression of a purely physical source not necessarily involving telepathy. If, for example, a water witch diviner can hold a witch hazel stick which turns down or indicates the presence of water, it would be the serious business of psychical research

to try to find out if, in fact, this process exists and if more than ordinary geological knowledge is involved.

"Q Any other areas of psychical research?

"A Also studies of mediumship or sensitives insofar as these people may be especially gifted in types of communication described as telepathy or clairvoyance, and so many of the phenomena which arose in the nineteenth century through the use of mediums became areas of investigation, scientific level investigation by psychical research.

"Q What is a medium?

"A The name comes from the fact that the medium is conceived to be an intermediary between the living and the deceased without prejudice as to whether or not, in fact, the communications do come.

"Q Is that about the framework of the area of psychical research?

"A It would take a very long time to detail, but most of the phenomena are some type of telepathy or clairvoyance or related processes."

The American Society for Psychical Research also engages in a field of endeavor known as parapsychology, defined by Dr. Murphy as "an aspect of psychical research which uses experimental methods." Among the members of both groups are prominent scientists and a number of medical doctors.

Appellant Still, a medical doctor, asserts that he has devoted much of his professional life to research and education in the fields of physiology, biochemistry, psycho-physiology, psychology and sociology. He has researched and published scientific papers in these areas. He explains his claim to the Kidd bequest partially on the basis of a keen interest in the subject. At his appearance before the Superior Court on August 18, 1967 in this matter, he expressed his interest in the following terms:

"Q Dr. Still, when did you first become interested as a scientist in the question of the soul?

"A I don't know exactly. These things sort of creep up on you, * * * but it has been roughly two years since I first began to consciously think in the direction that resulted in my writing that first draft of the theory which you have put in evidence, and which I intend to do some revising on before I submit it for publication. So the answer is roughly two years ago. That is, in a scientific way.

"Naturally, philosophically I have been interested since I was a child in many of these questions."

Dr. Still explained that he is a physician-scientist:

"Q BY MR. STERN: Dr. Still, how would you classify yourself, as a physician or a scientist?

"A Both. I am interested in studying problems relevant to the nature of life, especially those concerned with the life changes which we call aging.

"But when I am functioning as a physician I am also interested in applying the knowledge that we now possess to the problem of increasing human longevity and to improving the quality of life for people living today.

"To make that a little more explicit, I am a scientist all the time, but when I am dealing with basic science questions like the science of the soul, I am acting principally as a theoretical scientist; [and] when I am acting as a physician, I am acting as an applied scientist."

Dr. Still has written several magazine articles and at least one book pertaining generally to the question of life after death. He contends that he has already

developed, by his research and interest, "some scientific proof" of the existence of a soul, and that he has well-formulated plans for further research on the question. The record does not, however, show in any detail the nature and extent of Dr. Still's research methods or funds.

Appellee Barrow Neurological Institute was founded in 1962 as an integral part of St. Joseph's Hospital, Phoenix, by Charles Barrow in memory of Julia Barrow who had suffered an incurable brain tumor. It is one of only three such institutions on the North American continent, and has established an international reputation. Departments of Barrow Neurological Institute include laboratories in neurochemistry, neurophysiology, and physiological psychology.

Six witnesses testified on behalf of appellees Barrow Neurological Institute and Neurological Sciences Foundation at the hearings before the trial court held on June 7 and 9, 1967.

Harry Bandouveris, then the executive director of Neurological Sciences Foundation, testified that it was incorporated in 1960, was in good standing, and was qualified as a tax exempt organization under the Internal Revenue Code. Bandouveris further testified that funds are raised and received by Neurological Sciences Foundation solely for the purpose of medical research.

Eugene Joublanc, the executive director of Barrow Neurological Institute, testified that all of the funds received by Neurological Sciences Foundation were used by Barrow Neurological Institute solely in its research department. A schedule of the cost of research at Barrows was made part of the record. It shows a capital investment of approximately $700,000, and a total of research grants of approximately $1,700,000, of which not quite $500,000 was given to it by Neurological Sciences Foundation.

Dr. Joseph Harris, a Ph.D. in physiological chemistry, served for five years with Barrow Neurological Institute and was the head of its Neurochemistry Laboratory. He testified that this laboratory is engaged in research on chemical changes in the nervous system operating in conjunction with other organs, including the brain. Dr. Harris testified on direct examination regarding efforts of Barrow Neurological Institute most closely related to the finding of a soul:

"Q Is your department presently engaged in any research activity which is programmed to find the soul which leaves at the time of death?

"A If you mean by 'soul', as that aspect concerning the mind, then we do attempt to measure certain changes in the brain as soon after death as is possible.

"Q You use the word 'soul,' if I get you, with reference to the mind, is that correct?

"A Yes.

"Q This program has been one that normally has been conducted without reference to the present will that we speak of, is it not?

"A Yes. This research was started before I came to the Institute."

Dr. Harris offered that there is no religious basis of Barrow Neurological Institute's research:

"Q Do you have any recognition of the Neurological Institute as being operated on a religious basis as far as your is (sic) concerned in the research department?

"A There is absolutely and unequivocally no religious basis concerned. There is absolutely and unequivocally no direction from the Neurological Sciences Foundation nor the St. Joseph's Hospital in connection with my research.

"If there was any indication of this I would not be there."

On cross-examination by counsel for the American Society for Psychical Research, Dr. Harris was asked how Barrow Neuro-·

logical Institute would use the Kidd bequest:

"Q Will you tell us very specifically if you would, what you intend to do with any money you get out of this estate specifically?

"A My answer to the question is that my expenditure of funds, whether it comes from this estate or any other source, would continue to be in the same direction as I am now presently going, namely, to uncover information regarding the chemical correlates as I have outlined previously.

\* \* \* \* \* \*

"Q Let me ask you the original question again.

"What do you intend to do with the money you would get out of the Kidd estate?

"A We would like to continue to pursue, for example, what effect of a certain class of compounds such as the Hallucinogens have in specific areas of the brain.

"We already have preliminary data to suggest and indicate that they affect different parts of the brain in different ways. We have to find out exactly in what way.

\* \* \* \* \* \*

"Q Now, let me ask you another sort of basic question.

"James Kidd said he wanted to leave the money to somebody who would leave scientific proof of a soul that leaves the body at the time of death.

"Just what is the relationship between the work you have just told us about and the will of James Kidd?

"A To the extent that we are doing research as outlined previously, that with the bulwark of information that we may get one might eventually get to set up such information which could lead to his wish, his desire.

"Q One might eventually?

"A Come up with information leading to the fulfillment of his desire.

"Q As what you said before, you find what one is not looking for?

"A In part, yes, but not necessarily in its entirety.

"Any information we can get now will lead to framing questions which will allow us to ask the specific question. At the moment we cannot ask some of these specific questions.

"Q Well, would it be fair to say that if you did find and work in regard to a soul which leaves the body at the time of death it would be a by-product of what you are attempting to do?

"A Well, I don't know what you mean by 'by-product.'

"By-product infers that it is something that comes secondarily.

"Q That is right.

"A But this doesn't fit in my expression of the 'prepared mind.'

"Q I am sorry. I don't follow that at all.

"A You don't get these things just purely incidentally. They come by virtue of your ability to be able to syphon (sic) what is there even though you may not be looking for that specific thing.

"Q You are not looking for that specific thing, isn't that so?

"A I might indicate \* \* \* going back to the infectious disease situation, in finding out particular microorganisms which existed or did not exist or penicillin, these things were not necessarily by-products unless you used it in a very general sense.

"If they were purely by-products they would have been missed, but the investigators' preparedness allowed them to see this within the

framework that led to the development, which it did.

"Q I don't want to belabor the point."

Dr. Arthur J. Bachrach, head of the Department of Psychology at Arizona State University, and a consultant in neuropsychology at Barrows, was a co-author with Dr. Murphy of the American Society for Psychical Research in research done in parapsychology. He testified on direct examination that many scientists are leaving parapsychology research due to its inherent conflict with scientific experimental methods:

"Q Have you found the type of research that you have just described that you have done to be fruitful as scientific research?

"A No. * * * I think that my contact with the parapsychology group was one of the most rewarding experiences. I think there was a dedicated group of young people, most of those who have left the research, people who were very dedicated and serious scientists, and I think in large measure many of them have found that the frustrations of research in parapsychology were not fruitful enough and the payoff was too low and the problems were enormous, and because you run into all sorts of problems.

 * * * * * *

"I feel, as I say, I think this is a very legitimate area of research. It is a research in human personality, human performance, but I feel, too, that the payoff has not been very high. I think * * * Gardner Murphy felt that with all the years and years of research we had such a small bag of information and so many promises, leads which had really never come through, and I think that it is legitimate as an area of research, but I feel * * * that the minute you start doing experimental work or scientific research on this it disappears, and

therefore we don't know. All we have is anecdotal material by and large.

"I think we have reports, some of which are quite tantalizing; many of which just don't follow through."

The body of evidence presented on behalf of Barrow Neurological Institute and Neurological Sciences Foundation discloses that while Barrow's research does not include as a separate function a program entitled "research into the existence of a soul", the several areas of neurological research carried on there do comprise a well-executed application of the scientific method of research into areas which could ultimately, either directly, or as a corollary of such research, shed light on the question of the existence of a "soul of the human body which leaves at death."

■ Having considered the position of all of the appellants and of the appellees, we now turn to the question whether the trial court abused its discretion by naming the Neurological Sciences Foundation and Barrow Neurological Institute trustee and beneficiary.

■ The selection of a trustee of a charitable trust is a determination within the sound discretion of the trial court. In this connection, the discretion residing in a court of probate jurisdiction has been held to be "wide discretion." Helm v. Odle, 129 Ind.App. 478, 157 N.E.2d 584 (1959); In re Koretzky's Estate, 19 N.J. 352, 117 A.2d 1 (1955); Stone v. Baldwin, 347 Ill.App. 128, 106 N.E.2d 379 (1952), rev'd on other grounds 414 Ill. 257, 111 N.E.2d 97 (1953); In re Chapman's Estate, 258 Wis. 442, 45 N.W.2d 927 (1951); Accord 2A. Scott, The Law of Trusts, § 108.2 at 859 (3rd ed. (1967); Olivas, supra.

Arizona is among the majority of states with statutory provisions as to the appointment of trustees by the court in a trust created by will. A.R.S. § 14–1022, subsec. B provides in part:

"The court in which the administration is pending may appoint some proper person to fill a vacancy in the office of

trustee under the will, whether resulting from declination *or otherwise*, if it is necessary that such vacancy be filled to carry out the trust created by the will. * * *" (Emphasis supplied)

The Restatement (Second) of Trusts provides, insofar as appointment of a trustee by the court is concerned:

"If a trust is created and there is no trustee * * * a new trustee can be appointed

"(a) By a proper court; * * *."
(Restatement (Second) of Trusts § 108 (1959))

It is the contention of some of the appellants herein that under the trial court's interpretation of Kidd's will, the only words appearing there which retain any significance and remain operative are the words, " * * * balance money to go in a research * * *" and "soul of the human body which leaves at death." This, they argue, is true because Barrow Neurological Institute is, by the decree, clothed with the power and discretion of using the trust estate for any kind of research as long as (using the words of the decree) such research *"may lead* to *some* scientific proof of a soul of the individual which leaves the body at death." (Emphasis supplied) It is further asserted by most of the appellants that the obvious purpose of the trust is research or some scientific proof of a soul, yet the evidence adduced as to Barrow Neurological Institute and Neurological Sciences Foundation research programs indicates no specific mention of, or interest in, the "soul." The witnesses for Barrows, in fact, spoke of the soul only as "the consequence of existence" and a "function of the nervous system" or as an "aspect of the mind which disappears at death."

Thus the position of these appellants is that because Kidd dedicated his estate to "research or some scientific proof of a soul of the human body which leaves at death", it was an abuse of discretion on the part of the trial court to award the estate to a trustee who has no regard for the purpose designated by the testator.

We are here dealing with questions concerning the construction of a will, more properly questions of law than fact, and as previously indicated, there must be as a guiding principle an attempt to carry out the intent of the testator. In re Estate of Harber, supra; Newhall v. McGill, supra.

 The determination of the intent of the trustor involves a construction of the instrument, where construction is necessary, in the light of the surrounding circumstances at the time of the execution of the instrument. The court places itself in the position of the trustor at the time of the creation of the trust and interprets what he had said or done in the light of his environment at that time. Olivas v. Nat. Mis. of Presbyterian Church, supra.

The trial court in the instant case heard testimony and read exhibits presented on behalf of almost one hundred claimants in addition to these appellants. It is unnecessary for the determination of whether there was an abuse of discretion to here hold that none of the appellants is qualified to receive or administer the residuary bequest of the decedent. That was a proper determination for the trial court on the basis of all the evidence.

 The use in the judgment on appeal of the words "research which may lead to some scientific proof of a soul", as compared with the words in the will "research or some scientific proof of a soul", effects a liberal construction of the language of the testator, but one which, under the surrounding circumstances, does not do violence to the testator's intent.

The decree recognizes that research, even though directed to proof of a particular fact (here, existence of a human soul), may not result in proof of that fact, either because the research is not successful or because the "fact" is not a fact. It might indeed have been presumptuous for the court to distribute the bequest on the condition that it *shall* lead to proof of a soul of the human body which leaves at death.

That the trial court was able to determine what it considered to be the best

means to effectuate the will of the decedent from among the enormity of conflicting claims with which it was presented is a credit to its diligence. The court directed that the funds be used for the purpose of research which may lead to some scientific proof of a soul which leaves the body at death. In making that determination too, the decree imposed proper supervisory control over the administration of the trust by requiring that these appellees:

"Shall file with the court at least annually a full and complete report and accounting of its administration of said trust."

The supervision imposed is in accord with established Arizona law. Lowell v. Lowell, 29 Ariz. 138, 155–156, 240 P. 280, 286 (1925).

Affirmed.

STEVENS and CAMERON, JJ., concur.