106 Ariz. 554 (1971)
479 P.2d 697
In the Matter of the ESTATE of James KIDD, Deceased.
Joe H. CERNY, Emma G. Clausser, Russell L. Dilts, Psychical Research Foundation, Inc., the American Society for Psychical Research, Inc., and Joseph W. Still, M.D., Appellants,
v.
FIRST NATIONAL BANK OF ARIZONA, Phoenix, a national banking association, Administrator With the Will Annexed, Neurological Sciences Foundation, Inc., as Trustee, and Barrow Neurological Institute, Phoenix, Arizona, Appellees.
No. 10072-PR.
Supreme Court of Arizona, In Banc.
January 19, 1971.
*555 Welliever, Smith, Holt & Smith, Phoenix, for Joe H. Cerny.
Emma G. Clausser, in pro. per.
Carmichael, Johnson, Stephens & Vanlandingham, Phoenix, for Russell L. Dilts.
Strickland, Altaffer, Davis & Eppstein, Tucson, for Psychical Research Foundation, Inc. and the American Society for Psychical Research, Inc.
Sheldon Stern, Phoenix, Melvin Belli, San Francisco, Cal. (associated as counsel), for Joseph W. Still.
Divelbiss & Gage, Phoenix, for First National Bank of Ariz.
Gorodezky, Marron & Diamond, Allen L. Feinstein, Phoenix, for Neurological Sciences Foundation, Inc. and Barrow Neurological Institute.
STRUCKMEYER, Chief Justice.
This appeal is from a determination of heirship in which the rights of 103 claimants under the will of James Kidd were adjudicated.
James Kidd was a bachelor of frugal nature who came to Arizona about 1920. On January 2, 1946, he wrote a holographic will which was sealed in an envelope and placed in a safety deposit box. A few years later, Kidd disappeared without a trace. But it was not until shortly before March 6, 1964 that his will was discovered and on that date offered for probate. On proof *556 that Kidd had absented himself from Maricopa County, Arizona for such a period as to be presumed dead, see A.R.S. § 12-509, his will was admitted to probate and the First National Bank of Arizona was appointed as Administrator With Will Annexed.
Pursuant to A.R.S. § 14-641, the First National Bank filed a petition to determine heirship and subsequently moved for summary judgment, asking the court to declare that Kidd's will created a valid charitable trust. The trial court granted the motion of the bank, declaring that Kidd's will created a valid charitable trust, and set for hearing the petitions, statements of interest, and claims of those individuals and organizations who sought distribution of the estate under the terms of the will. Hearings were held which continued for a period of almost three months  the trial court taking testimony and receiving exhibits from more than sixty claimants in addition to the more than forty claims submitted without oral testimony.
After extended consideration, the court decreed that the claim of the Neurological Sciences Foundation be granted, and that the residue of James Kidd's estate, amounting to about $175,000.00, be distributed in trust to be used for the purpose of research to be performed and carried on by the Barrow Neurological Institute of Phoenix, Arizona. It rejected the petitions and statements of interest of the other 102 claimants.
Kidd's holographic will provided:
"This is my first and only will and is dated the second day in January 1946. I have no heirs have not been married in my life, after all my funeral expenses have been paid and #100. one hundred dollars to some preacher of the gospital to say fare well at my grave sell all my property which is all in cash and stocks with E.F. Hutton Co Phoenix some in safety box, and have this balance money to go in a research or some scientific proof of a soul of the human body which leaves at death I think in time their can be a Photograph of soul leaving the human at death,
James Kidd
(dated 2nd January 1946)
some cash in Valley bank some in Bank America LA Cal"
While the proceedings in the court below were extensive, the questions raised on this appeal by the admission to probate of this extraordinary document can in the main be determined perfunctorily.
We note first, as did the court in Opinion of the Justices, 109 N.H. 335, 251 A.2d 330, at 330:
"In this state the right of an individual to dispose of his property by will to individuals, public and private corporations, charities and public entities, * * *, is singularly free from restrictions or limitations, constitutional, statutory or judicial."
The power to make a will is a power that belongs to the testator and is not subject to a veto power of the courts. So, unless limited by statute, a testator may dispose of his property by will as he pleases. In In re Greene's Estate, 40 Ariz. 274, 11 P.2d 947, 949, this Court said:
"Nor is a court concerned with the abstract justice or injustice of the will. [Citation] Unless it clearly appears the testator did not fully realize what he was doing with his property, it was his to dispose of as he pleases."
And in In re Nolan's Estate, 56 Ariz. 353, 108 P.2d 385, 387, we said:
"The general rule is that in the absence of statutory provision limiting it, a man may dispose of his property as he sees fit, regardless of the fact that the prevailing code or morals may consider such disposition as unwarranted from any standpoint."
Other courts have said:
"The value of property consists largely in the right to dispose of it as the owner desires, and this power of disposal, either by deed or by will, is not to be interfered with so long as the requisite mental *557 capacity exists. Cole v. Drum, 109 Kan. 148, 197 P. 1105, and cases cited therein. The right to make a will includes the right to make it according to the testatrix' own desires, subject only to the statutory restrictions. It is no condition of this right that the will shall please a jury, or a court, or the testatrix' relatives, or anyone else. If the will was properly executed, and the testatrix was of competent sanity, and no undue influence has been established, it is the testatrix' will, and no tribunal is appointed on earth to inquire whether it ought to have been her will." In Re Millar's Estate, 185 Kan. 510, 345 P.2d 1033, 1041.
"Though a testator may be aged, infirm, and sick he has the right to dispose of his property in any manner that he may desire if his mental ability meets the law's tests. It is not for the courts, juries, relatives, or friends to say how property should be passed by will, or to rewrite a will for a testator because they do not believe he made a wise or fair distribution of his property." Farmer v. Dodson, 326 S.W.2d 57, 61 (Tex. Civ.App.).
"`No man is bound to make a will in such a manner as to deserve approbation from the prudent, the wise, or the good. A testator is permitted to be capricious and improvident, and is, moreover, at liberty to conceal the circumstances and the motives by which he has been actuated in his dispositions. Many a testamentary disposition may seem to the world arbitrary, capricious and eccentric, for which the testator, if he could be heard, might be able to answer most satisfactorily.'" In Re Wayne's Estate, 134 Or. 464, 291 P. 356, 362.
And see also, In re Woehr's Estate, 166 Cal. App.2d 4, 332 P.2d 818, 826; In re Heaton's Estate, 404 Pa. 360, 172 A.2d 293, 296-297; Feiler v. Feiler, 149 Ohio 17, 77 N.E.2d 237, 240.
Appellants are six of the 102 claimants whose statements of interest and claims were disapproved by decree of the court below. Four of the appellants, Emma G. Clausser, Joe H. Cerny, Joseph W. Still, M.D., and Russell Dilts, urge that the trial court erroneously ruled that a valid charitable trust was created by the words used in Kidd's will. They argue that the words in the residual clause, "* * * have this balance money to go in a reserach or some scientific proof of a soul * * *", are in the disjunctive, and that Kidd's intent was first, not to create a trust but to give an outright bequest to any person who had "scientific proof" of a soul which leaves the human body at death, and second, that a trust be established only if such "scientific proof" was not available.
Appellant Clausser believes she has such proof. She claims she saw her soul leave her body during a volunteer experiment in Stuttgart, Germany in 1937. Appellant Cerny's proof is in the nature of an inductive argument stemming from biblical writings. Appellant Still argues that he has "some scientific proof" (without stating it) at the present time, but he wishes to do further research based upon a thesis developed from his work in the fields of biochemistry, physiology, psychology, and sociology. Russell Dilts' unverified petition and statement of interest asserted that since 1948 he has engaged in the pursuit of scientific knowledge of psychical and spiritual phenomena including manifestations of the human soul. In this court he incorporates in his argument the arguments contained in all the briefs filed by the other appellants. A further reference to the Still and Dilts claims will be made later.
We think that the intent to make a testamentary trust rather than testamentary bequest is clear. The single most important element in the creation of a testamentary charitable trust is the manifestation by the testator of a charitable purpose. Kidd expressed the wish that research be conducted in a specific area  the existence of a soul of the human body which leaves at death. Such a purpose could have been considered by the trial court as advancing education or religion. *558 Both educational and religious purposes have been recognized as charitable in nature, Restatement (Second), Trusts § 368, §§ 370-371 (1957).
Although Kidd did not use language indicating the establishment of a trust, the absence of words of "trust" or "trustee" is not fatal.
"e. Direct gift to charity. If the owner of property devises or bequeaths it for charitable purposes, and not only does not name a trustee but also does not use language indicating that the property is to be held upon trust, nevertheless the disposition is valid. Thus, if a testator bequeaths a certain sum `to charity,' a charitable trust is created. So also, a charitable trust is created where the testator directs that a certain sum should be used to aid needy students, or to assist the poor.
In such cases the court will either appoint a trustee to carry out the purpose or will approve a scheme to carry it out. * * *" Restatement (Second), Trusts § 397, comment e (1957).
And see, In re Quinn's Estate, 156 Cal. App.2d 684, 320 P.2d 219, and Wilson v. Franz, 359 S.W.2d 630 (Tex.Civ.App.).
A literal reading of the clause "* * * have this money to go in * * * some scientific proof" is more indicative of the intention to create a trust than an absolute bequest. We gather from the record in the court below that as of the date of the execution of Kidd's will there was no accepted scientific proof of a soul of the human body. Accordingly, Kidd must have addressed this clause to the future, contemplating scientific research leading to proof of a soul which leaves the body at death.
Kidd's will clearly evidences his belief in the basic elements of historic Christianity  a belief in human responsibility, in a transcendent God, and in human survival of bodily death. Kidd was not deluded by modern secularism into assuming that the Christian view of the world is so dull and pointless that it is not worth investigating. The affirmation of God as taught by the Christian Creed  the Communion of Saints, the Resurrection of the Body, and the Life Everlasting  is more satisfying to the intellect and more enriching to the human personality than its etiolated substitute, scientific humanism, the pursuit of which has led to materialism and the lack of moral responsibility.
The thrust of the attack made by the two remaining appellants is directed against that part of the judgment of the court below finding that the Barrow Neurological Institute is qualified to execute the trust. The record in this respect may be summarized as follows: The Barrow Neurological Institute was founded in 1962 as part of the St. Joseph's Hospital of Phoenix, Arizona. The general area of research carried on by Barrow is into the normal and abnormal functioning of the nervous system, which includes the brain, the spinal cord, sense organs, peripheral nerves and central control of muscular activity. Barrow carries on specific research studies into various aspects of the human nervous system to the end of increasing man's knowledge of its complex functions.
Dr. Eduardo Eidelberg, Chief of the Laboratory of Neurophysiology, Chairman of the Department of Neurobiology, and Director of Research for the hospital, testified that Barrow has never and does not intend, at least in the foreseeable future, to do research in whether there exists a soul to the human body. He testified:
"Q In other words, if I understand you correctly then, there would be no specific attempt to use those funds for scientific research to determine whether there was a soul separate and apart from the central nervous system as such?
A Do you mean by that to directly test that question experimentally?
Q Yes.
A The answer is no, sir, because at the moment with methodology presently available, we don't think it is a testable question. It may be a good question, but it is not a testable one."
*559 The impact of the totality of the testimony of the witnesses for Barrow Neurological Institute is that the phenomena laymen ordinarily ascribe to the soul can be explained as part of the functioning of the central nervous system and that Barrow would not attempt to isolate the soul from the central nervous system as a separate and distinct entity. Since Kidd left his estate for research or scientific proof of a soul "which leaves at death", he obviously contemplated that the soul was a separate entity, distinct from the body or its central nervous system and surviving the body's physical dissolution. Manifestly, the Barrow Neurological Institute does not qualify under the plain intent of Kidd's will.
At least two of the appellants, the American Society for Psychical Research, Inc. and the Psychical Research Foundation, Inc., are qualified to carry out the specific purpose expressed in the will of James Kidd.
The American Society for Psychical Research was formally organized in 1906, principally through the efforts of William James, thought generally to be the most eminent of American psychologists. This society has a working capital of approximately $700,000.00, it publishes a quarterly journal, and its membership has included such well known figures as Sigmund Freud, Arthur J. Balfour, Margaret Mead, and J.B. Rhine. The American Society for Psychical Research is now headed by Dr. Gardner Murphy, who is also presently the Director of Research of the Menninger Foundation.
One of the stated purposes of the Society is psychical research in all of its aspects, of which "survival research" is one of its recognized subdivisions. As Dr. Murphy explained, "Psychical research is the study of psychological processes for which we have no physical explanation as physics now exist." Dr. Murphy further explained that most of the phenomena associated with the field of psychical research are some type of telepathy or clairvoyance or related processes.
As to "survival research" itself, the American Society for Psychical Research studies and disseminates information as to "crisis apparitions" (whereby a person receives a "vision" of another person undergoing a crisis experience, often death, at another place), "deathbed visions" (whereby a dying person appears to undergo a transformation allowing him to see into another world), "physical changes in the surroundings" (whereby the death of a person is signaled by the disturbance of a physical object some distance away), and "out-of-the-body experiences" (whereby a person in a sleeping or comatose state appears to himself to wander forth from his body and take up a station some distance away, purportedly sometimes to be seen there by others). Dr. Murphy testified that the American Society for Psychical Research would use the Kidd funds to make further studies and experimentation to determine whether a measurable physical event occurs at the moment of death. Dr. Murphy testified that the American Society for Psychical Research would attempt to measure whether there are "material aspects in human psychic existence" by the use of such equipment as photography, especially infra-red photography, weight and pressure and temperature measures, photoelectric beams, and sound instruments.
Dr. Murphy summarized the view of the American Society for Psychical Research as to how such experimentation would tend to prove there is a "soul" which survives at the time of death:
"Q How would this tend to prove there is a soul which survives at the time of death?
A The issue is, classically, whether the soul has a material aspect or is purely psychological without a material aspect.
All of the experiments I am trying to describe do involve a physical aspect. They do suggest whether or not at the moment of death the soul, the entity which gives life to the individual, simply departs as a psychological or spiritual *560 entity, or whether it has material implication which might even be photographed.
I think this type of research would enrich our understanding of what the moment of death is. It may enlarge our comprehension as to what we mean by the word `soul'."
The Psychical Research Foundation was founded in 1961 for the sole purpose of engaging in "scientific and educational activities proximately directed toward securing and disseminating reliable information with respect to the survival upon termination of the living organism of the mental, spiritual, and personality character of man or any parts or aspects of them."
Joseph Gaither Pratt, president and member of its board of directors, is a member of the faculty of the Department of Psychiatry of the University of Virginia. His position is as a psychologist, in which position he does full-time research in the field of parapsychology. Pratt received an A.B. degree from Duke University, a master's degree in psychology, and completed his thesis and all requirements for a Ph.D. in 1936. He served as research assistant to Dr. J.B. Rhine at Duke University and thereafter spent two years with Dr. Gardner Murphy at Columbia University in experimental work in extrasensory perception. He rejoined Dr. Rhine as a member of his research staff, doing full-time research in parapsychology. There he stayed, with the exception of four years during the second World War, until 1964 when he joined the staff of the University of Virginia.
Dr. Pratt testified that there are two principal areas in the field of psychology, the conventional, which is largely dedicated to attempting to understand behavior in human nature in terms of physical principles, and the parapsychological, which are those exceptional things which occur which come about by noting that there are exceptions that do not fit into the ordinary conventional physical considerations. Dr. Pratt has been the author and co-author of books in the field of parapsychology and has published some eighty to ninety articles on the subject.
Dr. Pratt further testified that the Psychical Research Foundation was founded by Charles E. Ozanne who felt that there was a need for some organization that would more explicitly, more specifically concentrate on work in the area of survival interest through scientific investigation. He founded the Foundation in order that there be an organization that would be exclusively dedicated to that purpose. In addition to its board of directors, it has an advisory committee of such people as Professor Gardner Murphy, Professor C.D. Broad, who is described as a world famous philosopher at Cambridge University, author of several books concerned with the problem of the evidence bearing upon the survival question, and Professor H.H. Price of Oxford University, recently retired. Dr. Pratt stated that the net worth of the Psychical Research Foundation was somewhere between $300,000.00 and $350,000.00, in trust with the Wachobia Bank in Durham, North Carolina.
Dr. Pratt testified that the Foundation has been involved in direct experiments in the field of survival research and that research reports have been published in the literature of journals which are dedicated to the publication of religious and scientific work in this field. He testified that "soul" is a term that everyone in common language understands as applying to some aspect, a part of man's nature, which we generally conceive would survive death. It was his opinion that Kidd was concerned with having research done on the question of whether some aspect of man's nature survives and if it does, we can call this aspect "soul" or "spirit" or what you will. The Psychical Research Foundation has been from its inception engaged in such specific and restricted line of endeavor.
It is apparent from what has been summarized of the purposes and operations of the American Society for Psychical Research and the Psychical Research Foundation that at least two organizations exist *561 which the court below could have found were competent to carry out the testamentary trust established by Kidd's will.
The appellees Neurological Sciences Foundation and Barrow Neurological Institute urge that this appeal cannot be decided unless a transcript of the evidence of all 103 claimants is furnished on appeal, instead of only those parties involved in the appeal. But we think otherwise. The basis of the claim by the Barrow Neurological Institute is clearly expressed in the transcript of the testimony of its officers. They do not consider it possible to discover proof of a soul which leaves at death and, consequently, do not propose to attempt scientific research to that end. No other testimony can possibly change these facts. Consequently, the court does not need the testimony of other claimants in order to determine the merits of the claim of Barrow.
The appellants Joseph W. Still and Russell Dilts assert that they wish to and are competent to seek scientific proof of a soul of the human body which leaves at death. Accordingly, this case is reversed with directions that the court below enter into a final determination as to which of the four appellants, Joseph W. Still, Russell Dilts, the American Society for Psychical Research or the Psychical Research Foundation, is most suitable to carry out the trust expressed in Kidd's will.
Judgment reversed with directions.
HAYS, V.C.J., LOCKWOOD, J., and McFARLAND, J., Retired, concur.
Note: The Honorable JAMES DUKE CAMERON, Justice, having disqualified himself, the Honorable ERNEST W. McFARLAND, Justice, Retired, was called to sit in his stead.
UDALL, Justice (dissenting):
I am unable to agree in the reversal of this cause, as I am of the opinion that there was not a clear abuse of discretion by the trial court in its selection of Barrow Neurological Institute as the claimant best suited to carry out the intent of the testator.
The conclusions reached in the majority opinion can be summarized as follows:
1. James Kidd left a valid will.
2. His will created a charitable trust, the proceeds of which are to be used for the purpose of conducting research as to the existence of a soul of the human body which leaves at death.
3. The testimony of the officers of Barrow Neurological Institute reveals that they do not consider it possible to discover proof of a soul which leaves at death, and, consequently, do not propose to attempt scientific research to that end. Manifestly, the Barrow Neurological Institute does not qualify under the plain intent of Kidd's will.
4. Two of the appellants, the American Society for Psychical Research and the Psychical Research Foundation, are organizations which the court below could have found were competent to carry out the testamentary trust established by Kidd's will.
5. In addition, appellants Joseph W. Still and Russell Dilts assert that they wish to and are competent to seek scientific proof of a soul of the human body which leaves at death.
6. Accordingly, the case is reversed with directions that the court below enter into a final determination as to which of these four appellants (ASPR, PRF, Still, and Dilts) is most suitable to carry out the trust expressed in Kidd's will.
The first two conclusions by the majority opinion as listed above are consistent with the judgment of the trial court, as affirmed by the Court of Appeals.[1] With these two conclusions by the majority, I agree. Although it was never stated in so many words, the thrust of the remaining conclusions reached by the majority is that *562 the trial court was guilty of an abuse of discretion in selecting Barrow Neurological Institute as the claimant best suited to carry out the research suggested by the will. With this conclusion by the majority I cannot agree, as I am of the opinion that such an abuse of discretion by the trial court is not shown by the record. This is not to say the four appellants designated by the majority opinion are not qualified  rather, only that the record, in my opinion, does show them to be less qualified than Barrow Neurological Institute, and that the judgment of the trial court, concurred in by the Court of Appeals, should therefore be affirmed.
The reasoning which has led me to the above conclusion can perhaps best be demonstrated by reference to the following questions:
1. What was Kidd's intent?
2. Could the trial court reasonably have concluded that, of the claimants before it, Barrow was best qualified to carry out the testator's intent?
I. WHAT WAS KIDD'S INTENT?
The rule to be followed by the courts in construing wills was stated in Newhall v. McGill, 69 Ariz. 259, 212 P.2d 764 (1949), to be as follows:
"The cardinal rules for construction of all wills is to ascertain the intention of the testator, and this intention is to be ascertained from the words of his will, taking into view when necessary or appropriate the circumstances under which it was made. * * * The court will determine from the context of the will what the testator intended and give that intention effect. * * * It is an elementary rule in the construction of wills that the language used must be liberally construed with a view to carrying into effect what the will as a whole shows was the real intent of the testator." 69 Ariz. 259 at 262, 266, 212 P.2d 764 at 766, 769.
As is stated above, Kidd's intent must be ascertained from the words of his will, taking into view the circumstances under which it was made.
Kidd's holographic will provided:[2]
"Phoenix, Arizona
Jan 2nd 1946
This is my first and only will and is dated the second day in January 1946. I have no. heirs have not been married in my life, after all my funeral expenses have been paid and #100. one hundred dollars to some preacher of the gospital to say fare well at my grave sell all my property which is all in cash and stocks with E.F. Hutton Co Phoenix some in safety box, and have this balance money to go in a reserach or some scientific proof of a soul of the human body which leaves at death I think in time their can be a Photograph of soul leaving the human at death,
James Kidd
(dated 2nd January 1946)
some cash in Valley bank some in Bank America LA Cal"
The above is Kidd's will in its entirety. The trial court received no extrinsic evidence as to Kidd's intent. Therefore, it is necessary that Kidd's intent be construed by reference to the language in his will and in light of surrounding circumstances at the time of the execution of the instrument. As we stated in State ex rel. Goddard v. Coerver, 100 Ariz. 135, 412 P.2d 259 (1966):
"The determination of the intention of the settlor, where construction is necessary, will be made in light of surrounding circumstances at the time of execution of the deed. The court places itself in the position of the settlor at the time of creation of the trust and interprets what he has said or done in light of his environment at that time. In the instant case the language used does not plainly express the intention of the grantor, and, therefore, it is necessary *563 for us to look at circumstances surrounding the execution of the deed to determine if a trust was intended, and if so, the nature of any trust so created, its terms and its beneficiaries." 100 Ariz. 135 at 141, 412 P.2d 259 at 263.
The directive by Kidd to have a preacher "say fare well" at his grave suggests that he had a personal conviction of the existence "of a soul of the human body which leaves at death." The subsequent language suggests a desire on his part to prove the existence of a soul to others, as he dedicated his estate to the purpose of developing "scientific proof" of the existence of such a soul.
Kidd's will was executed in January, 1946, a time when scientific and technological developments were receiving considerable attention. Perhaps Kidd was of the opinion that if there was any way in which people generally could be convinced of the existence of a soul, it would be by the showing of "scientific proof" of such a fact.
Kidd's understanding of the terms "research", "scientific", and "proof" may well have been consistent with common usage at the time of the execution of his will (1946). Common usage might best be discerned by reference to Webster's Dictionary.[3] Webster defines "research" as:
"Studious inquiry or examination; specif. and usually, critical and exhaustive investigation or experimentation having for its aim the discovery of new facts and their correct interpretation, the revision of accepted conclusions, theories, or laws, in the light of newly discovered facts, or the practical applications of such new or revised conclusions * * *."
"Scientific" is defined by Webster as:
"Agreeing with, or conducted or prepared strictly according to, the principles and practice of or for the furtherance of exact science, esp. as designed to establish incontestably sound conclusions and generalizations by absolute accuracy and perfect disinterestedness of investigation; skilled in the methods of exact science; characteristic of a true scientist * * *."
The dictionary defines "proof" as being:
"That degree of cogency, arising from evidence, which convinces the mind of any truth or fact and produces belief; demonstration; also, that which proves or tends to prove; that which induces, or tends to induce, certainty of the judgment; evidence. Properly speaking, proof is the effect or result of evidence; evidence is the medium of proof. * * *"
Consolidating these separate definitions might provide a basic working definition of the phrase "research or scientific proof." One such definition might be: "A critical and exhaustive investigation or experimentation, conducted strictly in accordance with the principles of exact science, which would tend to develop or produce evidence having that degree of cogency which convinces the mind of a truth or fact."
Additional insight into the concept of the scientific approach or method can be obtained by examination of testimony given and exhibits produced before the trial court. For example, Dr. Arthur J. Backrach, head of the Department of Psychology at Arizona State University, defined his understanding of the scientific approach or method as follows:
"A Well, briefly, I would say that scientific method is a self-correcting method in the sense that it starts off with collection of data and facts.
It is then tested by setting up hypotheses and experiments in research to test our theoretical positions or hypothetical *564 prospects based on these facts, and then to correct the hypotheses by confirming or refuting them, adding to the store of knowledge which then is in need of further testing.
I think one of the things that characterizes the scientific method is that it is always self-correcting and always seeking for further information.
It is fundamentally an experimental method in terms of conducting controlled studies based on amassing facts, and the testing of hypotheses show that there is not such thing as a final answer in the scientific method. It assumes that you are always studying, and that as you get more and more information this opens up more and more areas of reresearch so that it is very much of, if I may say so, an ethical kind of approach in the sense that it is based on respect for truth, integrity, and that data are important and not individuals in the sense that no person, no matter how venerable himself, can long stand if he does not have the facts or his theoretical propositions don't hold.
I think this is the science of self-correction, which is the best phrase for this, and continual search for truth."
After considering the words of the will and the circumstances under which it was made, and keeping the above definitions in mind, I am of the opinion that Kidd's primary goal was scientific proof, and that the reference to research and to a photograph of a soul leaving the human at death are merely suggestions as to means which might be employed in order to obtain such proof. I think this distinction is important, as it is my impression that the majority opinion places almost total emphasis on the means to be employed (i.e., the specific type of research) rather than the end result (i.e., scientific proof). I will expand upon this point later on in this dissent.
II. COULD THE TRIAL COURT REASONABLY HAVE CONCLUDED THAT, OF THE CLAIMANTS BEFORE IT, BARROW WAS BEST QUALIFIED TO CARRY OUT THE TESTATOR'S INTENT?
The judicial selection of a trustee to receive a bequest and administer the provisions of a trust is one which rests in the sound discretion of the court, involving matters of fact and judgment. The trial court in the instant case heard testimony and read exhibits presented by over 100 claimants, and, after due consideration of the various claims, entered its judgment which provided for the distribution of the residuary estate of James Kidd to Neurological Sciences Foundation, Inc., as Trustee, and Barrow Neurological Institute, in trust for the purpose expressed by decedent in his will.
Each of the appellants on this appeal claims to be better entitled than Barrow to receive the residuary estate of decedent. The principal question is whether the trial court abused its discretion in selecting Barrow, rather than one of the appellants, to receive the residuary bequest of the decedent.
In support of the judgment, the evidence presented before the trial court shows, in my opinion, that Barrow is well qualified to receive and administer the residuary bequest of the decedent in accordance with the terms of his will. These terms were in essence incorporated in the decree and were imposed as express conditions of the trust, and Barrow is required to file with the court at least annually a complete accounting of its administration of the trust.
It is not necessary, in order to support the selection of Barrow, to find that none of the appellants is qualified to receive or administer the residuary bequest of the decedent. The determination is one that must properly be made by the trial court on the basis of all the evidence. So long as there is competent evidence to support *565 the selection of Barrow, the judgment of the trial court should be affirmed.
It is my opinion that the evidence presented by Barrow, both by oral testimony and by exhibits, fully supports the judgment of the trial court.
It is obviously impossible to quote a very large part of the trial record in an appellate opinion. However, I feel that certain portions of the record, as discussed hereafter, are representative of the testimony presented to the trial court and will tend to demonstrate that there is competent evidence to support the selection of Barrow by the trial court. This material will be summarized as: (A) evidence presented by Barrow; (B) evidence presented by the appellant; and (C) analysis and conclusion.
A. Evidence Presented By Barrow
The testimony and exhibits presented on behalf of Barrow which are most relevant to this dissent are as follows:
Dr. Joseph Harris, the holder of a doctorate in physiological chemistry and a research professor in the Department of Chemistry at Arizona State University, served with Barrow Neurological Institute for five years and was the head of its Neurochemistry Laboratory. Dr. Harris testified that his laboratory is engaged in research on chemical changes in the nervous system operating in conjunction with other organs including the brain.
In answer to a question as to whether his department was engaged in any research activity which is programmed to find the soul which leaves at the time of death, Dr. Harris stated that using the word "soul" as concerning or relating to the mind, then his department does attempt to measure certain changes in the brain as soon after death as possible. Dr. Harris stated that Barrow Neurological Institute offers a "unique opportunity for collaborative and a close multidiscipline investigation of the nervous system", to try "to obtain a complete understanding of the functioning nervous system."
Dr. Eduardo Eidelberg, Chief of the Laboratory of Neurophysiology, Chairman of the Department of Neurobiology, and Director of Research for the hospital, described the function of Barrow Neurological Institute as relating primarily to the treatment of patients who suffer from neurological diseases, to the training of physicians in the specialties corresponding to the medical research in neurology, and to the conducting of specific research on brain function and diseases. Dr. Eidelberg described the brain as "the major part of the nervous system", which also includes the spinal cord, sense organs, peripheral nerves and the center control of muscular activity.
Dr. Eidelberg discussed the research facilities of Barrow and stated that there are only two other neurological research institutions in Canada and the United States similar to Barrow. He described the areas of present research of Barrow, including a project on the effects of hallucinogenic drugs on certain aspects of brain function and a study on the development of the new-born brain.
In answer to a question as to whether the research work being done at Barrow could fall within the research of proof of a soul of the human body which leaves at death, Dr. Eidelberg stated that he thought it was "not possible at the present time to divine exactly whether the soul has specific existence by and of itself, that is, as an independent entity or whether it is the expression of the function of the body, primarily of the central nervous system". In that latter respect, he stated it would be logical and reasonable to study out the nervous system operation to produce behavior as to what in common language is known as a "soul." He stated that he did not know of any current technique or current use in any laboratory that would furnish scientific proof of a soul, but that this would not preclude the possibility that such techniques might develop later. He added that if there were to be scientific proof of a soul, he could not think of any way in which the knowledge *566 could be acquired other than as a result of scientific research.
The majority opinion states that the testimony of the officers of Barrow Neurological Institute shows that they "do not consider it possible to discover proof of a soul which leaves at death and, consequently, do not propose to attempt scientific research to that end." The majority opinion concludes that "manifestly, the Barrow Neurological Institute does not qualify under the plain intent of Kidd's will." With this interpretation of the record I disagree. The following testimony by Dr. Eidelberg on cross-examination is representative of that given by the Barrow witnesses, and may serve to clarify the issue.
"Q First, I would like to ask you, Doctor, if as you have testified, you believe at this time there is no objective method available by which to prove or disprove the existence of the soul as a portion or a separate entity of the central nervous system, could you tell us then how you or Barrow Neurological Foundation would utilize the funds in the event that they found themselves to be the recipient of these funds?
A It is my own opinion that the answer to that question is a long time proposition, that is, that we need to know, in my opinion, conceivably more about a number of things before we can formulate, before we can get to that foundation where we can ask coherent, testable questions regarding the final objective.

As I said before, the central nervous system is the area we know least about in medicine, and therefore, I think this is almost an ultimate question.
* * * * * *
Q Would it be accurate to say that the continuation of the research which you are presently conducting, with or without these funds, the plans presently of Barrow Neurological is that in the event that something constructive or objective, or something could be determined that would be conducive to objective research, then and to the existence of the human soul or the nonexistence of it were determined, this would be strictly a by-product of any other research?
A Let me answer this way:
If the opportunity developed by progress in current technology to the point where we could research the question directly and objectively and with proper scientific controls, you can be sure we would jump into it right away.
* * * * * *
Q Is it more probable than not that a by-product of your research on the central nervous system would result in the determination of some type of proof of the type that Mr. Kidd was seeking?
A Again, I am not sure that is within the province of a professional scientist to foretell things that might or might not happen in the future.
I would answer, though, that whatever progress is made in human knowledge, including the knowledge about existence of a soul and so forth, is much more likely to come as a result of systematic scientific research than as a result of intuitive flight of fancy." [Emphasis added.]
The body of evidence presented on behalf of Barrow Neurological Institute and Neurological Sciences Foundation discloses that while Barrow's research does not include as a separate function a program entitled "research into the existence of a soul", the several areas of neurological research carried on there do comprise a well-executed application of the scientific method of research into areas which either directly, or as a corollary of such research, might ultimately result in scientific proof of the existence of a "soul of the human body which leaves at death."
B. Evidence Presented by the Appellants
There were over 100 claimants who presented evidence to the trial court. Of *567 those, only six have appealed from the judgment of the trial court. The majority opinion concluded that two of the appellants, the American Society for Psychical Research and the Psychical Research Foundation, are organizations which the court below could have found were competent to carry out the testamentary trust established by Kidd's will. Also, that two other appellants, Joseph W. Still and Russell Dilts, asserted that they wish to and are competent to seek scientific proof of a soul of the human body which leaves at death. The majority opinion accordingly reversed the case with directions that the court below determine which of these four appellants is most suitable to carry out the trust expressed in Kidd's will.
My objective at this point in this dissent is to demonstrate the basis for my opinion that the record does not show an abuse of discretion by the trial court. I believe this can best be done by comparing and contrasting the research methods and approach used in neurological research with that used in psychical research. In this section of the dissenting opinion, therefore, I will review portions of the evidence presented by the American Society for Psychical Research and the Psychical Research Foundation  the two appellants which are engaged in psychical research, including survival research.
Dr. Gardner Murphy, whose credentials are well-summarized in the majority opinion, is a recognized authority in the field of psychical research. Appearing before the trial court as a witness on behalf of the American Society for Psychical Research, Dr. Murphy described the nature of psychical research to be as follows:
"Q Will you tell us briefly what psychical research is?

A Psychical research is the study of psychological processes for which we have no physical explanation as physics now exist.

If, for example, we communicate through sound waves this would be approached in physical terms, but if we can engage in telepathic interchange this would be carried out by some process that is not explainable in terms of contemporary physical theory.
Q Can you give us some samples of areas which are encompassed within the framework of psychical research?

A Telepathy would stand up quite prominently and would include both experimental telepathy or attempts to convey specific information.
Q What does telepathy mean?
A Telepathy is the exchange of information from one person to another by means other than the sensory.
Q Can you give an example?
A In the collection of so-called spontaneous cases of telepathy you find, for example, the following: Mrs. Packet at work in her kitchen is suddenly overwhelmed by a vision of her brother being hurled to his death. She is sure that this means something that is not accidental. In time it turns out that her brother working on a tugboat in Chicago Harbor tripped over a rope and was thrown to his death approximately at the time.
These so-called spontaneous cases or crisis apparitions have been collected by the hundreds and are independent, of course, of certain natural studies.
Q Are there any other areas of psychic research that you would like to relate to the Court?
A Psychical research would also deal with so-called second sight or clairvoyance in which a person might get an impression of a purely physical source not necessarily involving telepathy.
A If, for example, a water witch diviner can hold a witch hazel stick which turns down or indicates the presence of water, it would be the serious business of psychical research to try to find out if, in fact, this process exists and if more than ordinary geological knowledge is involved.

*568 Q Any other areas of psychical research?
Also studies of mediumship or sensitives insofar as these people may be especially gifted in types of communication described as telepathy or clairvoyance, and so many of the phenomena which arose in the nineteenth century through the use of mediums became areas of investigation, scientific level investigation by psychical research.
Q What is a medium?
A The name comes from the fact that the medium is conceived to be an intermediary between the living and the deceased without prejudice as to whether or not, in fact, the communications do come.
Q Is that about the framework of the area of psychical research?

A It would take a very long time to detail, but most of the phenomena are some type of telepathy or clairvoyance or related processes." [Emphasis added.]
Other testimony by Dr. Murphy on direct examination:
"Q Doctor, if you did the research that you have just told us about, and if you were allocated $200,000 or any lesser sum, do you believe you would be able to then prove the existence of the soul which survives at death?

A No. Proof is much too strong a word.

Q What would you be able to do?
A I think we would know something about material effects which are related to the cessation of life. I think at the moment of death there would be physical changes which might very well indicate the probability that something is leaving.

"This, however, leads into very complicated philosophical questions in the nature of time and space. I would not use words like `proof.'" [Emphasis added.]
On cross-examination, Dr. Murphy was asked:
"Q * * * [I]s there at the present time an accepted hypothesis in the scientific world as to factually what the soul is?

A No.

Q There is not? Now, has anyone ever been able to examine cases of crisis apparitions under what you would consider a controlled or laboratory type condition to your knowledge?

A Not under really very good conditions. There have been a number of cases of two-way communication between people in coma or deep sleep which are psychologically rather similar to the crisis apparition, but as I tried to bring out, the crisis apparition involves a crisis or tragedy occurring to a distant person and could not therefore be set up experimentally. You would wait and you would study when you got word of such a crisis.
* * * * * *
Q But you are still not prepared at this time or under the current situation of research in this area to relate any of these phenomena that end up to be provable scientifically of a soul that departs from the human body at death?

A I think they would be rather directly related in the sense they would connect two series of physical observation with each other, one having to do with the presence of the dying person or the person in a crisis; the other having to do with a person at a distant point perhaps undergoing a heart or blood pressure change or what-not. Insofar as you had physical equipment and would be able to study both ends of this, you would be able to add to the study of the physical dimensions which at present are weakly investigated." [Emphasis added.]
In other testimony on cross-examination, Dr. Murphy discussed work he had done in other areas related to psychical research, *569 including experiments with hypnotism and suspended animation.
Dr. Joseph Gaither Pratt, whose testimony on behalf of the Psychical Research Foundation was referred to in the majority opinion, indicated that the general field of parapsychology includes:
"crisis apparitions, deathbed visions, out-of-the-body experiences, clairvoyance, audiopsychometry, psychokinesis, poltergeist phenomena, ESP, and working with sensitives."
On cross-examination Dr. Pratt was asked what particular experiments had been undertaken in the last three years by the Psychical Research Foundation:
"Q Let me put it this way. To the best of your knowledge has [sic] there been investigations which have been concerned with unusual physical effects connected with particular persons or particular locations?

A I am thinking of effects that we would normal [sic] cover under the term `poltergeist phenomena,' and `haunting phenomena'.

You know, poltergeist cases are instances in which unexplainable physical disturbances erupt, generally in a household but not always in a home or household, and these are disturbances that seem to be centered, as the investigations have developed and accumulated, centered around a particular individual.
Q Let me ask you this, Dr. Pratt. How many of those has Psychical Research Foundation investigated in the last three years and with what results?

A Again, I can't be absolutely certain about the number. I would say roughly a half dozen such cases have been investigated over this period of time, and the results have been such as to strengthen the evidence already accumulated in past cases, that these phenomena are not explainable in ordinary terms.

The success of the investigation of individual cases, specific cases, will vary because the circumstances under which the investigation is conducted will vary.
To be able to arrive on the scene in time to be present when these phenomena are occurring puts an investigator in a much more favorable situation than when he hears about it after the disturbances have run a normal course and ceased.
Q Has the Psychical Research Foundation been able to witness such activity at the time?

A In the general term of `witness,' yes.

Q Not afterwards. What I am talking about is observing.
A Yes.
Q They have observed?
A Now, again, I am accepting your term `witness,' and your term `observe,' not in the sense of physical direct seeing but in the sense of being present in the location where these things were occurring, being able to talk to the people who are concerned, being able to observe the situation, keep track of the situation's change, situation changes in location of different people, and having the disturbances occur in the room where the investigators were present.
Q Is the report of the investigator subsequently made by the investigator based on what the investigator saw and heard or what the investigator was told by the people present?

A The report would include both kinds of information." [Emphasis added.]
The testimony quoted above provides insight into the nature of the research performed by the American Society for Psychical Research and the Psychical Research Foundation. Some of the testimony given before the trial court was directed toward an evaluation of such research. For example, one of the persons testifying on behalf of the American Society for Psychical *570 Research was Dr. Frederick Dommeyer, a professor at San Jose State College. He was asked:
"Q Do you think the work suggested by Dr. Murphy if completed would prove or disprove conclusively the existence of a soul?
A I don't frankly like the word `conclusively' there. After all, scientific generalization, hypotheses, theories and laws are merely statements that have a probability value, but I would certainly say that if the investigation that Dr. Murphy suggests was carried out we might very well advance in the direction of a solution to some of these problems in the field of psychical research.
Q Is there any theory of the soul with which scientists can work at the present time? Do you think scientific research at this stage must consist of combining merely information about reports and events and experimenting with that hypothesis?

A Well, I don't think that today the hypothesis of the soul is testable in a scientific sense, but this doesn't mean that it won't be in time * * *." [Emphasis added.]
It is interesting to note the similarity of this statement, by a witness testifying on behalf of one of the organizations engaged in psychical research, with that of Dr. Eidelberg, who testified on behalf of Barrow:
"Q In other words, if I understand you correctly then, there would be no specific attempt to use those funds for scientific research to determine whether there was a soul separate and apart from the central nervous system as such?
A Do you mean by that to directly test that question experimentally?

Q Yes.
A The answer is no, sir, because at the moment with methodology presently available, we don't think it is a testable question. It may be a good question, but it is not a testable one." [Emphasis added.]
This testimony by Dr. Eidelberg was quoted in the majority opinion as support for the conclusion by the majority that Barrow has not, and will not, do research as to whether there exists a soul of the human body which leaves at death. The majority reached this conclusion in spite of testimony by witnesses for Barrow to the contrary, including the statement by Dr. Eidelberg that if a change in technology made it possible to research the question directly, "we would jump into it right away." [See testimony of Dr. Eidelberg quoted earlier in this dissent.]
One of the witnesses appearing before the trial court was uniquely qualified to analyze and compare the approach used in neurological research with that in psychical research. That witness was Dr. Arthur J. Bachrach, chairman of the Department of Psychology at Arizona State University and a consultant in neuropsychology at Barrow. Earlier in his career he had co-authored a book with Dr. Gardner Murphy of the American Society for Psychical Research, and had studied and worked in parapsychology at the University of Virginia.[4] Dr. Bachrach's definition of the scientific approach or method was quoted earlier in this dissent. He testified on direct examination that many scientists are leaving parapsychology research due to its inherent conflict with scientific experimental methods:
"Q Have you found the type of research that you have just described that you *571 have done to be fruitful as scientific research?

A No. I would say from my own standpoint, no. I think that my contact with the parapsychology group was one of the most rewarding experiences. I think there was a dedicated group of young people, most of those who have left the research, people who were very dedicated and serious scientists, and I think in large measure many of them have found that the frustrations of research in parapsychology were not fruitful enough and the payoff was too low and the problems were enormous, and because you run into all sorts of problems.
* * * * * *

My own research [which] Murphy and I discussed at great length, and also discussed with Rhine at Duke at one time was completely negative. The results we got in the experiment did not show anything. I think this is not unusual. When you get into  I think Rhine himself has said  that when you get into scientific studies of phenomena such as E.S.P. and telepathy and clairvoyance we don't really know if they do exist.
Well, as Rhine says  and I think this is an interesting observation  Rhine says when you start experimental and scientific studying of something like E.S.P. it disappears because you are interfering with the particular kind of activity, so we never will know in a sense whether or not these things do exist if you take a straight scientific method, because Rhine says that the method itself interferes with the phenomena, and so we have very little in the way of true experimental evidence.

* * * * * *
[W]ith all the years and years of research we had such a small bag of information and so many promises, leads which had really never come through, and I think that it is legitimate as an area of research, but I feel perhaps Rhine is right, that the minute you start doing experimental work or scientific research on this it disappears, and therefore we don't know. All we have is anecdotal material by and large.

I think we have reports, some of which are quite tantalizing; many of which just don't follow through." [Emphasis added.]
On cross-examination Dr. Bachrach was asked for his opinion as to where to best start to study the soul leaving the body at the time of death. He replied:
"A * * * I would say that the place to start with any scientific study involving the mind or the soul or whatever these abstractions would be, would be in the brain.

Q Why would you start studying the brain?

A * * * If the area of the soul and mind as abstractions are derived by a philosophical and theological groups from human behavior, I still think the way you start is in the area of working with the human body just as I feel, for example, that I would not start with extrasensory perception. I would start with sensory perception and carry on the normal research to the point where we cannot get any answers before I would then work at a hypothesis which starts with things to be outside of the normal.

I don't like the term `paranormal,' or `extrasensory,' because we don't know enough about normal perceptions, and we don't know enough about psychology, and we don't know about normal information.

I would like to start where we could get the most information first. I believe that extra perception is a very legitimate area of research. I would *572 not say this is an unscientific approach. But you don't start out in science by assuming hypotheses which are outside of your general information.

You start out and say, `We are going to carry our research up to a point where we cannot any longer use an explanation which is within our own data,' and then, only then, do you accept hypotheses which are beyond the scientific, and I think the way to start is a research in human behavior just as in vision optics.

I would start in brain functions. I would want to know what kind of people  if you get an individual who is reported to be a sensitive, I would like to start an individual like this on an examination of his visual auditory [capacity]. Does he have some particular kind of sensitivity in a normal perception range that other individuals may not have?
To the same degree I think this is where you start. I think if you start up as a scientist you have to start off accepting the least involved explanation of a phenomenon, the most economical explanation. If I may go off for a moment here, I think that you find in the flying saucer business, for example, that it is important for an agency such as the Air Force to try to account for every item with the most economical explanation. Is it a weather balloon or a reflection of light or car lights bouncing off some cloud layers?
This is the most economical explanation, and the least economical explanation is that this is a visitor from outer space.
Now, the scientific method demands that you start off with the least involved, the most economical explanation by testing out whether weather balloons were in that area, whether there may have been plane activity, and you try to find out a natural phenomenon to explain something like this.

You may exhaust very quickly all but a handful of these, and I think this is what has happened, that they still have some sightings that they can't account for. I think when you can't account for these by natural explanation, then and only then do you begin to look for more involved and less economical explanations." [Emphasis added.]
In this section of the dissent I have discussed some of the basic approaches used in psychical research as well as some of the problems which arise in attempting to perform experiments and develop evidence in accordance with standards acceptable to the general scientific community.
The previous section of this dissent discussed the activities of Barrow in the field of neurological research.
The next, and final, section of the dissent compares and contrasts psychical research with neurological research in order to reach some conclusions as to whether the trial court abused its discretion in selecting Barrow Neurological Institute as the claimant best suited to carry out the intent of the testator.
C. Analysis and Conclusion
At the beginning of this dissent, I stated what I believe James Kidd's intent to have been  to convince people generally of the existence of a soul by the showing of "scientific proof" of such a fact.[5] I also suggested that a basic working definition for *573 the phrase "research or scientific proof" might be:
"A critical and exhaustive investigation or experimentation, conducted strictly in accordance with the principles of exact science, which would tend to develop or produce evidence having that degree of cogency which convinces the mind of a truth or fact."
The question in this case has not been merely whether the human soul does in fact exist, or of whether a given claimant was convinced in his own mind that he had proof of the existence of the human soul. Rather, the question has been that of determining which claimant might best demonstrate or develop "scientific proof" which would be of such a nature as to convince people generally of the existence of the human soul.
Appellant American Society for Psychical Research and appellant Psychical Research Foundation have contended that their research activities are oriented more directly toward the question of the existence of the human soul than are the more conventional and perhaps less adventuresome research activities of Barrow Neurological Institute. Even if this contention is assumed to be true, however, it does not necessarily follow that those organizations are better qualified to carry out the testator's intent, as the question still remains as to how credible and convincing the results of such research would be to the scientific community and to people generally.
The evidence developed by Barrow in its research activities has been of a type which is clearly acceptable to the scientific community and to people generally as being in accordance with generally accepted methods of scientific research. In fact, much, and perhaps most, of such evidence is of a nature as would be admissible in a court of law, although this element is not necessary to the determination of this case.
On the other hand, it is my impression that much of the evidence developed through psychical research is considered questionable by the scientific community and unconvincing to people generally. As indicated by the record before this Court, and as discussed in both this dissent and the majority opinion, some of the primary areas of emphasis in the field of psychical research are telepathy, mediums, crisis apparitions, deathbed visions, out-of-the-body experiences, hypnotism, and suspended animation. Psychical research consists, to a large extent, of the collecting of anecdotal accounts of persons claiming to have experienced psychical phenomena of some type and of performing experiments which in many cases cannot be reproduced under controlled laboratory conditions. Many of these methods or theories are apparently considered questionable by the scientific community and unconvincing by people generally, and accordingly would not lend themselves to the establishment of "scientific proof", as that term has been defined herein. In fact, in a court of law, much of this evidence would be considered inadmissible as being "hearsay" evidence or in some other way failing to meet the standards established under the rules of evidence.[6]
In considering the question of whether the trial court abused its discretion in selecting Barrow Neurological Institute as the claimant best suited to carry out the intent of the testator, I consider it important to note that the trial court listened to and observed all of the witnesses and had for its consideration all of the exhibits introduced *574 into evidence, whereas on this appeal only a portion of the trial record is before this Court. The trial court was therefore in the better position to determine which claimant was best qualified to carry out the intent of the testator. The case presented complex questions of law and fact which required the exercise of sound judgment by the trial court. In my opinion, the trial court properly concluded that, of the claimants before it, Barrow was best qualified to carry out the testator's intent.
For the reasons advanced above, I am of the opinion that there was not a clear abuse of discretion by the trial court in its selection of Barrow Neurological Institute as the claimant best suited to carry out the intent of the testator.
I would accordingly affirm the judgment of the trial court.
NOTES
[1] The opinion of the Court of Appeals is at 12 Ariz. App. 58, 467 P.2d 770 (1970).
[2] Spelling and punctuation are the same as in the original.
[3] Webster's New International Dictionary, Second Edition (Unabridged). The definitions as quoted above are worded the same in the edition of the dictionary which was in use in 1946.
[4] Dr. Bachrach appeared before the trial court as a witness on behalf of Barrow Neurological Institute. His testimony is included in this section of the dissent, rather than in the preceding section with the testimony of other witnesses for Barrow, because of its value for purposes of comparing and contrasting neurological research with psychical research.
[5] Apparently none of the evidence produced at the trial was such as would constitute existing scientific proof of a soul. There obviously is no guarantee that such proof will in fact be developed; however, there is apparently a possibility of such, and this case has proceeded on that assumption in attempting to determine which claimant might best carry out the testator's intent.
[6] The trial court was most liberal in the admission of evidence offered before it by the claimants. The trial court sat without a jury and was therefore free to disregard such evidence as was not competent or material. Perhaps it was for this reason that the court allowed evidence to be presented by these appellants which may well have been considered inadmissible under a strict interpretation of the rules of evidence.